# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF VERMONT

UNITED STATES OF AMERICA    :
                               :
                               :   Case No. 2:11-cr-103
       v.               :
                               :
DAVID M. MULLINS,        :
                               :
             Defendant.   :

## Opinion & Order:
## Defendant's Motion to Dismiss the Indictment

The Indictment charges David Mullins with failing to register or update his registration as a sex offender after travelling in interstate commerce between approximately January and April 2008. ECF No. 3. Mullins filed a motion to dismiss the indictment, ECF No. 21, raising a number of constitutional challenges to the law under which he is charged, The Sex Offender Registration and Notification Act ("SORNA" or the "Act"), 42 U.S.C. §§ 16901-62, 18 U.S.C. § 2250, all of which have been rejected by the Second Circuit.[1] Mullins also raises a

---

[1]   *See United States v. Lott*, No. 2:11-cr-97, 2012 WL 2048218, at *2 (D. Vt. June 6, 2012) (citing *United States v. Guzman*, 591 F.3d 83 (2d Cir.), *cert. denied*, 130 S. Ct. 3487 (2010)). Mullins more recently filed a supplemental memorandum modifying his Commerce Clause challenge based on the Supreme Court's decision in *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566 (2012). ECF No. 26. As the Court today orders the indictment dismissed on independent, statutory grounds, it does not reach Mullins's novel constitutional claim.

1

statutory argument based on a provision of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, posing a question not yet settled by the Circuit: whether SORNA criminalized his conduct at the time charged.  As the Court agrees with Mullins that SORNA did not validly apply to him between January and April 2008, it **grants** his motion to dismiss.  However, the Court will stay implementation of this ruling thirty days so the government may determine whether to file an appeal and request an extension of the stay.

## Background

Mullins was convicted in Indiana in 1985 on two counts of the state offense of child molesting, receiving a twenty-five year sentence.  In January 2008, Mullins moved to Vermont with his wife, where they lived with her sister.  According to the government, Mullins did not register in this state as a sex offender until April 22, 2008, after his wife's sister discovered his criminal history and reported him to the authorities.  In October 2011, Mullins was convicted in Massachusetts state court on three counts related to an attempted rape, earning him a five to seven year sentence. Several months prior to the Massachusetts convictions, the government brought the instant charge, basing Mullins's SORNA

---

*See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J. concurring).

violation on his 2008 failure to register after travelling to Vermont.

SORNA was enacted on July 27, 2006 as Title I of the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, Title I, §§ 101-55, 120 Stat. 587, 589-611 (2006). It was the latest in a line of legislation aimed at addressing the national problem posed by recidivist sex offenders, particularly those who might cross state borders to evade local registration requirements. *See Carr v. United States*, 130 S. Ct. 2229, 2238-39 (2010). Congress's steady program has been to guide and enhance existing state-level enforcement. *Id.* at 2238. In 1994, it set national standards for state sex offender registries, and also conditioned award of certain federal funds on states adopting a criminal penalty for sex offenders' failure to register as required. *Id.* at 2238-39; *see* Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, Pub. L. No. 103-322, Tit. XVII, § 170101(a)-(c), (f), 108 Stat. 1796, 2038-42 (1994). That approach bore fruit. By 1996, every state had enacted its own mandatory registration provisions for convicted sex offenders, versions of what is generically known as "Megan's Law." *See Smith v. Doe*, 538 U.S. 84, 89-90 (2003).[2]

---

[2] A federal amendment of the same name, passed in 1996, required states to "release relevant information that is

Also in 1996, Congress made it a federal offense for any person required to register "who changes address to a State other than the State in which the person resided at the time of the immediately preceding registration," and "knowingly fails to" meet the registration requirement within ten days. Pam Lychner Sexual Offender Tracking and Identification Act of 1996, Pub. L. No. 104–236, § 2, 110 Stat. 3093, 3095-96 (1996); *Carr*, 130 S. Ct. at 2239. Beginning in 1998, first time violators of the federal crime faced up to one year in prison and repeat offenders could earn up to ten years in confinement. 42 U.S.C. § 14072(i) (1999). While the details are not material here, Congress continued to make improvements to its regime. *See* The Jacob Wetterling Improvements Act of 1997, Pub. L. No. 105-119, § 15, 111 Stat. 2440, 2461-67; Protection of Children from Sexual Predators Act of 1998, Pub. L. No. 105-314, § 607, 112 Stat. 2974, 2985-86 (1998); The Campus Sex Crimes Prevention Act, Pub. L. No. 106-386, Title VI, § 1601, 114 Stat. 1464, 1537-38 (2000); Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today (PROTECT) Act of 2003, Pub. L. No. 108-21, Title VI, §§ 604-06, 117 Stat. 650, 688 (2003).

In passing SORNA in 2006, Congress was motivated by the concern that despite the foundation it had laid, many sex

necessary to protect the public concerning a specific person required to register under this section." Megan's Law, Pub. L. No. 104–145, 110 Stat. 1345 (1996).

offenders were still escaping state registration requirements
via interstate travel. *See United States v. Van Buren*, 599 F.3d
170, 175 (2d Cir.), *cert. denied*, 131 S. Ct. 483 (2010). In
particular, congressional supporters "placed considerable
importance upon the registration of pre-Act offenders,"
emphasizing that more than 100,000 had gone "'missing.'"
*Reynolds v. United States*, 132 S. Ct. 975, 982-83 (2012) (citing
legislative history). It thus sought to establish a
"comprehensive national registration system." *Van Buren*, 599
F.3d at 175. SORNA was "enacted to address the deficiencies in
prior law that had enabled sex offenders to slip through the
cracks." *Carr*, 130 S. Ct. at 2240. In doing so, Congress
largely built within the existing framework, continuing its
focus on strengthening state efforts to combat recidivist sex
offenders. *Id.* at 2239. It tied to federal highway funds a
heightened state criminal penalty for failure to follow
registration requirements. *Id.; see* 42 U.S.C. § 16913(e). It
mandated that federal and state sex offenders register with
their controlling jurisdictions and timely update their
information as it changes, 42 U.S.C. §§ 16911, 16913(a). *See*
*Reynolds*, 132 S. Ct. at 978.

It also augmented the federal crime for failure to
register, setting the penalty at up to ten years in prison for
any offender, and added a crime of violence enhancement of

between five and thirty years.  18 U.S.C. § 2250(a), (c).  The law, as it concerns Mullins, applies to one "required to register" under SORNA who travels in interstate commerce, but fails to register or update his registration as SORNA requires. *Id.* § 2250(a).  Congress did not decide, as the Supreme Court made clear in its decision last term in *Reynolds v. United States*, whether that criminal sanction should apply equally to sex offenders with registration obligations springing from sex offenses committed prior to SORNA's passage.  132 S. Ct. at 984; *see* 42 U.S.C. § 16913(d).  Instead, it gave the Attorney General "the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this chapter or its implementation in a particular jurisdiction," 42 U.S.C. § 16913(d).  *See Reynolds*, 132 S. Ct. at 984.  It also empowered the Attorney General "to prescribe rules for the registration of any such sex offenders."  42 U.S.C. § 16913(d).

In February 2007, Attorney General Gonzales issued an interim rule that purported to apply SORNA to pre-Act sex offenders.  Applicability of the Sex Offender Registration and Notification Act (the "Interim Rule"), 72 Fed. Reg. 8894-01 (Feb. 28, 2007) (codified at 28 C.F.R. §§ 72.1-72.3 (2007)).  In imposing that rule, the Attorney General claimed a waiver from the APA's publication and delayed implementation requirements,

6

under its "good cause" exceptions.  *Id*. at 8896; *see* 5 U.S.C. §

553(b)(B), (d)(3).  The Interim Rule was intended "to eliminate

any possible uncertainty about the applicability of the Act's

requirements—and related means of enforcement, including

criminal liability under 18 U.S.C. 2250 for sex offenders who

knowingly fail to register as required—to sex offenders whose

predicate convictions predate the enactment of SORNA."  72 Fed.

Reg. at 8896.  It also relied on the "practical dangers" of

> additional sexual assaults and child sexual abuse or
> exploitation offenses by sex offenders that could have
> been prevented had local authorities and the community
> been aware of their presence, in addition to greater
> difficulty in apprehending perpetrators who have not
> been registered and tracked as provided by SORNA.

*Id.* at 8896-97.  To provide advance publication of the rule,

engage in notice and comment rulemaking before it became

effective, or to delay implementation of the regulation thirty

days, as required by the APA, would "accordingly be contrary to

the public interest."  *Id.* at 8897.  The Attorney General did,

however, permit "post-promulgation public comments."  *Id.* at

8896.

Binding as of August 1, 2008, Attorney General Mukasey

reaffirmed SORNA's retroactive application and issued a more

comprehensive set of interpretive guidelines after full

opportunity for notice and comment.  The Nat'l Guidelines for

Sex Offender Registration and Notification (the "SMART

7

Guidelines"), 73 Fed. Reg. 38030-01 (July 2, 2008). This Court has already followed every circuit to reach the question in holding that the Attorney General exercised his authority to declare the law applied to pre-Act offenders, at the latest, when the SMART Guidelines took effect. *Lott*, 2012 WL 2048218, at *5; *United States v. Mee*, No. 5:11-cr-101, 2012 WL 1638436, at *6 (D. Vt. May 9, 2012).[3]

In this case, the indictment charges Mullins with violating SORNA at least three months prior to the SMART Guidelines taking effect. SORNA could only have applied to him if the Interim Rule, issued about a year before the charged period, was a valid exercise of the Attorney General's authority.

## Discussion

### I. Whether the Interim Rule may be upheld under the APA's Good Cause Exceptions

In examining the validity of the Interim Rule, "the Court is limited to reviewing the Attorney General's proffered justification for good cause." *United States v. Cotton*, 760 F.

---

[3] Effective January 28, 2011, Attorney General Holder finalized the Interim Rule after complying with standard APA procedure. Applicability of the Sex Offender Registration and Notification Act, 75 Fed. Reg. 81849-01 (Dec. 29, 2010) (codified at 28 C.F.R. § 72). This action sought to dispel any possible challenge to the SMART Guidelines' validity. *Id.* at 81850. No court, however, has held that the SMART Guidelines were insufficient in exercising the Attorney General's power to apply SORNA to offenders with only pre-Act convictions. *See United States v. Stevenson*, 676 F.3d 557, 561 n.2, 562 (6th Cir. 2012) (collecting cases).

Supp. 2d 116, 130 (D.D.C. 2011); *see Natural Res. Def. Council v. Abraham*, 355 F.3d 179, 205 n.13 (2d Cir. 2004) ("'It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'") (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983)). The Interim Rule may be may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Zhang v. Slattery*, 55 F.3d 732, 744 (2d Cir. 1995), *abrogated on other grounds by statute*, 8 U.S.C. § 1101(a)(2).[4]

## A. The Good Cause Exceptions

The APA typically requires that "[g]eneral notice of proposed rule making shall be published in the Federal Register." 5 U.S.C. § 553(b) (the "Publication Requirement"). Afterward, "the agency shall give interested persons an opportunity to participate in the rule making through submission

---

[4]     There is some question in the case law as to whether *de novo* review is more appropriate to scrutinize a decision to invoke the good cause exceptions. *See Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012); *United States v. Valverde*, 628 F.3d 1159, 1162 (9th Cir. 2010), *cert. denied*, 132 S. Ct. 1534 (2012). Other recent cases firmly apply the more deferential arbitrary and capricious standard. *See, e.g.*, *United States v. Johnson*, 632 F.3d 912, 928 (5th Cir.), *cert. denied*, 132 S. Ct. 135 (2011); *United States v. Dean*, 604 F.3d 1275, 1278 (11th Cir.), *cert. denied*, 131 S. Ct. 642 (2010). The Court need not weigh in on this point, as it finds the decision to issue the Interim Rule arbitrary and capricious. *Valverde*, 628 F.3d at 1162 (holding same).

of written data, views, or arguments with or without opportunity
for oral presentation." *Id.* § 553(c). After publishing the
final version of the rule, the agency must allow at least thirty
days to elapse before it takes effect. *Id.* § 553(d) (the "Delay
Requirement"). The Publication and Delay Requirements each may
be waived for good cause. *See id.* § 553(b)(B), (d)(3).[5]
However, both exceptions "should be 'narrowly construed and only
reluctantly countenanced.'" *Zhang*, 55 F.3d at 744 (quoting
*Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1236
(D.C. Cir. 1994)). Rulemakings that impose criminal sanctions
must particularly "be held to the strict letter of the APA."
*United States v. Picciotto*, 875 F.2d 345, 346 (D.C. Cir. 1989).

The good cause exception to the Publication Requirement is
the most litigated of the two. It is available "when the agency
for good cause finds (and incorporates the finding and a brief
statement of reasons therefor in the rules issued) that notice
and public procedure thereon are *impracticable, unnecessary, or
contrary to the public interest*." 5 U.S.C. § 553(b)(B)
(emphasis added). The provision's legislative history reveals
the limited circumstances in which Congress intended it to

---

[5]     The Publication Requirement is also inapplicable to
"interpretative rules, general statements of policy, or rules of
agency organization, procedure, or practice." *Id.* § 553(b)(A);
*see id.* § 553(d)(1)-(2) (specifying similar exceptions to the
Delay Requirement). The government does not claim such safe
harbors apply here.

apply, such as "'situations of emergency or necessity.'" *Nat'l Nutritional Foods Ass'n v. Kennedy*, 572 F.2d 377, 384-85 (2d Cir. 1978) (Friendly, J.) (quoting S. Rep. No. 79-752 (1945)). The Senate Report defined each of the key statutory terms:

> "Impracticable" means a situation in which the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings. "Unnecessary" means unnecessary so far as the public is concerned, as would be the case if a minor or merely technical amendment in which the public is not particularly interested were involved. "Public interest" supplements the terms "impracticable" or "unnecessary"; it requires that public rule-making procedures shall not prevent an agency from operating and that, on the other hand, lack of public interest in rule making warrants an agency to dispense with public procedure.

*Id.* (internal quotations omitted). The "unnecessary" prong does not apply to this case, since the Interim Rule is not a mere technical amendment of limited public concern. Rather, it imposes new registration requirements and potential criminal sanctions on a wide swath of sex offenders throughout the United States. *Johnson*, 632 F.3d at 930 ("[T]he Attorney General's rule applied federal criminal liabilities to pre-enactment sex offenders. This is not a rule of minimal import.")

Imminent threats to the legislative scheme, unforeseen by Congress when it drafted the underlying legislation, may fit under the "impracticable" or "public interest" rationales. *See Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754-55 (D.C. Cir. 2001); *see also Jifry v. FAA*, 370 F.3d 1174, 1179-80

(D.C. Cir. 2004) (upholding regulation, issued post-September 11 without notice and comment on assertion of good cause, allowing allowed FAA to revoke pilot's licenses of non-citizens deemed a security threat by the TSA); *Am. Fed'n of Gov't Emps. v. Block*, 655 F.2d 1153, 1157 (D.C. Cir. 1981) (sustaining good cause exception as it applied to temporary poultry facility inspection regulations issued in response to a district court injunction, when the absence of the new rules would have left the industry operating under outdated standards and could have upended the consumer poultry market); *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 n.15 (5th Cir. 1979) (citing cases in which the exception has been successfully applied that involve government price controls that markets might exploit if given advance notice). Exceptions are not available simply to meet a statutory deadline or "to circumvent the notice and comment requirements whenever an agency finds it inconvenient to follow them." *Id.* at 213-14. The desire to accelerate the benefits of a rule is also insufficient. *Zhang*, 55 F.3d at 747.

The exception to the Delay Requirement applies where "provided by the agency for good cause found and published with the rule." 5 U.S.C. § 553(d)(3). Several courts have noted that the Delay Requirement serves a different purpose than the Publication Requirement. *See Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1485 (9th Cir. 1992) (citing cases); *Am. Fed'n of*

*Gov't Emps.*, 655 F.2d at 1156.  It provides regulated parties time to adjust their behavior to eventually conform to the new administrative requirements, as "until the final rule is published, the public is not sure of what the rule will be or when the rule will actually be promulgated." *Riverbend Farms, Inc.*, 958 F.2d at 1485.

### B. Application to the Interim Rule

Prior to *Reynolds*, the Second Circuit had followed several other Circuits in determining that SORNA applied to pre-Act sex offenders by the statute's own force.  *See United States v. Fuller,* 627 F.3d 499, 507 (2d Cir. 2010), *vacated by* 132 S. Ct. 1534 (2012); *see United States v. DiTomasso*, 621 F.3d 17, 25 (1st Cir. 2010); *United States v. Shenandoah*, 595 F.3d 151, 163 (3d Cir. 2010); *United States v. May*, 535 F.3d 912, 918–19 (8th Cir. 2008); *United States v. Hinckley*, 550 F.3d 926, 932 (10th Cir. 2008).  That approach made the Interim Rule redundant, and questioning its validity superfluous.  *Reynolds* abrogated those cases, and now requires courts to consider when the Attorney General acted on his authority to apply SORNA's requirements retroactively.  132 S. Ct. at 984.  The Second Circuit has not yet determined whether the Interim Rule validly extended SORNA's requirements to pre-Act offenders.  *See United States v. Caraway*, No. 10-3545-cr, 2012 WL 3064829, at *1 (2d Cir. July 30, 2012) (noting the issue is unresolved and the subject of a

13

circuit split, and thus finding the district court's failure to consider it *sua sponte* was not plain error).

Six other circuits have engaged in a vigorous debate on the topic, resulting in a sharp circuit split. On one side of the divide, three courts—the Fourth, Seventh, and Eleventh Circuits— hold the Interim Rule was valid under the good cause exceptions. *United States v. Gould*, 568 F.3d 459, 470 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 1686 (2010); *United States v. Dixon*, 551 F.3d 578, 585 (7th Cir. 2008), *rev'd on other grounds sub nom.*, *Carr*, 130 S. Ct. 2229; *Dean*, 604 F.3d at 1282.

The Eleventh Circuit provided the most comprehensive analysis to back its conclusion.[6] It found adequate the Attorney General's rationale that SORNA required swift clarification, and that delay would increase the risk that sex offenders might elude registration and reoffend. *Dean*, 604 F.3d at 1280-81. It described that prior to the Interim Rule, implementing jurisdictions and sex offenders were uncertain whether the law's requirements extended to those with convictions that pre-dated the new legislation. *Id.* at 1280. It also stated that "SORNA brings to bear the power of federal law enforcement, including the United States Marshals Service, to assist in locating and

---

[6]     The Seventh Circuit did not discuss the question, declaring the APA argument "frivolous." *Dixon*, 551 F.3d at 583. The Fourth Circuit's limited its explanation to one paragraph. *See Gould*, 568 F.3d at 470.

apprehending sex offenders who fail to register" and increases penal incentives for sex offenders to comply. *Id.* at 1281. By contrast, preexisting federal law was less comprehensive and more lenient toward sex offenders. *Id.* at 1281-82.

On the other side of the debate, the Fifth, Sixth, and Ninth Circuits all have found the Interim Rule was not a lawful exercise of the good cause exceptions.[7] *Johnson*, 632 F.3d at 930; *United States v. Utesch*, 596 F.3d 302, 310 (6th Cir. 2010); *Valverde*, 628 F.3d at 1165. Those courts have noted the Attorney General's asserted imperative for immediate action is undercut by Congress's choice to delegate the decision, and by the Attorney General himself, who waited seven months to issue the Interim Rule. *See Johnson*, 632 F.3d at 928-29; *United States v. Cain*, 583 F.3d 408, 421 (6th Cir. 2009); *Valverde*, 628 F.3d at 1166; *see also Zhang*, 55 F.3d at 746 ("A mere recitation that good cause exists, coupled with a desire to provide immediate guidance, does not amount to good cause."). Congress, if it had wished, could either have declared SORNA retroactive immediately on its own, or eased the APA's requirements to expedite the Attorney General's rulemaking. *Cain*, 583 F.3d at 421. It did not take such steps. Rather, it adopted a patient

---

[7] Although the D.C. Circuit has yet to reach the issue, the District Court for the District of Columbia held the Interim Rule's departures from Section 553 procedures unjustified. *Cotton*, 760 F. Supp. 2d at 127-30.

approach, by, for example, giving jurisdictions three years to update their laws to comply with SORNA. *Gould*, 568 F.3d at 480 (Michael, J. dissenting).

On the public safety question, these courts describe how the Interim Rule largely repeats the concerns Congress had already noted in passing SORNA, without offering any new challenge that would require action on an expedited timeline. *Cain*, 583 F.3d at 422; *Valverde*, 628 F.3d at 1167. Moreover, the Interim Rule did not take into account the considerable preexisting federal and state law, including a federal criminal provision, that already applied to sex offenders. *Id.* at 1167-68; *Gould*, 568 F.3d at 478-79 (Michael, J. dissenting). The law was not a blank slate; the issue was "whether the addition of one more layer of federal protection atop a substantial quilt of existing state and federal laws merited emergency treatment." *Dean*, 604 F.3d at 1283 (Wilson, J. concurring); *see also Johnson*, 632 F.3d at 933 n.74 (highlighting that even based on estimates used by members of Congress in legislative debates, the "vast majority" of sex offenders "were in compliance with state registration requirements" at the time SORNA was passed).

The Interim Rule imposed more severe federal criminal sanctions on sex offenders than had previously existed, extending a ten year maximum sentence to first time offenders and adding a crime of violence enhancement, to take examples

16

most relevant to Mullins. *See* 18 U.S.C. § 2250(a), (c);
*Johnson*, 632 F.3d at 930; *Cain*, 583 F.3d at 423-24. Since the
Attorney General waived the Delay Requirement's thirty-day
implementation period, sex offenders, without warning, were
asked to comply with SORNA's enhanced provisions or face steep
penalties. *Gould*, 568 F.3d at 481 (Michael, J. dissenting);
*Dean*, 604 F.3d at 1286 (Wilson, J. concurring). The unfair
surprise of that result balances heavily against a finding of
good cause for the Delay Requirement exception. *See id.*
Finally, neither soliciting post-promulgation comments, nor
initiating notice and comment rulemaking with respect to the
SMART Guidelines, cures the Interim Rule's deficiencies.
*Utesch*, 596 F.3d at 310-11; *Gould*, 568 F.3d at 477 (Michael, J.
dissenting) (pointing out additionally that the Attorney General
never formally responded to post-promulgation comments received
on the Interim Rule).

The Court agrees with the Fifth, Sixth, and Ninth Circuits,
and accordingly holds that the Attorney General violated the APA
in invoking the good cause exceptions to issue the Interim Rule.
Simply put, the Interim Rule provides no reason for expedited
coverage of pre-Act offenders that Congress had not already
considered. Congress could have applied SORNA to that class of
individuals immediately and on its own power, or by granting the
Attorney General specific authority to waive APA rules, but it

did not.  Instead, it deliberately deferred action on whether and how to apply SORNA to pre-Act offenders.  The Attorney General cannot claim good cause to accelerate his decision using precisely the same reasons Congress had in mind when it asked him to decide the issue without authorizing him to deviate from APA norms.

Certainly, the Court does not wish to minimize Congress's finding of a clear and substantial public safety threat in recidivist sex offenders.  However, the lengthy history of congressional and state effort to address the problem, dating at least to 1994, belies the Attorney General's stated need for urgent action.  In addition to the substantial network of preexisting federal law, the Interim Rule "merely allowed the federal government to prosecute under SORNA sex offenders who were currently violating state registration laws and thus were already subject to prosecution under existing state laws." *Gould*, 568 F.3d at 478 (Michael, J. dissenting).  As the Attorney General himself described in the Interim Rule, "there have been national standards for sex offender registration and notification in the United States" since 1994, and "[a]ll states currently have sex offender registration and notification programs and have endeavored to implement the Wetterling Act standards in their existing programs."  72 Fed Reg. at 8895.  He noted that SORNA "reforms are generally designed to strengthen

and increase the effectiveness of sex offender registration and notification for the protection of the public, and to eliminate potential gaps and loopholes under the preexisting standards." *Id.* "Such language bespeaks a fine-tuning, not an emergency." *Dean*, 604 F.3d at 1285 (Wilson, J. concurring).

The Attorney General's belief that the law's uncertainty justified his decision is weak and has only been weakened in the wake of *Reynolds*. *Reynolds* made clear that the ball was in the Attorney General's court from the day SORNA was passed. *See* 130 S. Ct. at 984. Any delay or confusion that may have existed prior to the Interim Rule stemmed from a failure to initiate rulemaking proceedings sooner. *Cf. Cotton*, 760 F. Supp. 2d at 128 (rejecting the need-for-guidance rationale "because any regulation has the effect of resolving uncertainty"). Were long-term clarity the concern, "[t]raditional notice-and-comment process with promptly promulgated final rules was the clearest path to clarify the Act." *Johnson*, 632 F.3d at 929.

Waiving the Delay Requirement was particularly troubling here. After seven months of inaction, the Attorney General denied pre-Act sex offenders the standard thirty day grace period to prepare before becoming subject to the full brunt of the law's new requirements. *Dean*, 604 F.3d at 1286 ("[O]n the day after the Attorney General promulgated its regulation, sex offenders likely had no clue that their maximum federal

penalties for failing to register had increased overnight from one year to ten.") (Wilson, J. concurring).  Finally, providing for post-promulgation feedback was, at best, meager consolation. "It is antithetical to the structure and purpose of the APA for an agency to implement a rule first, and then seek comment later." *Paulsen v. Daniels*, 413 F.3d 999, 1005 (9th Cir. 2005).

Without question, the good cause exceptions are an "important safety valve," *U.S. Steel Corp.*, 595 F.2d at 214 (describing exception to the Publication Requirement), for nimble and responsive governance when used in moderation.  But they constitute "essentially an emergency procedure." *Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982).  Invoked lightly, they threaten the ability of citizens to provide input in rulemaking that may profoundly shape their lives and livelihoods.  *See Riverbend Farms, Inc.*, 958 F.2d at 1483-84; *U.S. Steel Corp.*, 595 F.2d at 214.  For the provisions to maintain the limited application Congress intended, *Kennedy*, 572 F.2d at 384-85, more restraint is required from our administrative agencies than was displayed here.  The Court concludes the Attorney General's decision to invoke the good cause exceptions in the Interim Rule was arbitrary and capricious, lacking a foundation for altering standard rulemaking procedures.  It was therefore issued in violation of the APA.

## II.  Prejudice Analysis

The government argues that even if the Interim Rule was invalid as an exercise of the good faith exceptions to the Publication and Delay Requirements, any error is harmless as it relates to Mullins's case.  It asserts that Mullins could present no claim that the Attorney General failed to consider in issuing the Interim Rule.  Gov't's Opp'n to Mot. to Dismiss 9.

The APA requires "that in reviewing agency action, 'due account shall be taken of the rule of prejudicial error.'" *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659 (2007) (quoting 5 U.S.C. § 706).  The burden of showing prejudice "normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).  However, it is not "a particularly onerous requirement." *Id.* at 410; *see N.Y. Pub. Interest Research Grp. v. Whitman*, 321 F.3d 316, 334 n.13 (2d Cir. 2003) ("the standard for demonstrating lack of prejudicial error is strict").  In cases in which prejudice is clear, "nothing further need be said." *Shinseki*, 556 U.S. at 409.  Courts are sometimes also permitted, in evaluating these claims, to rely on "empirically based generalizations about what kinds of errors are likely, as a factual matter, to prove harmful." *Id.* at 411.  In less clear cases, or if "the party seeking an affirmance makes a strong argument that the evidence on the point was overwhelming

regardless," the challenger may need to provide proof of the harm she suffered. *Id.* at 410.

As a general matter, "we must exercise great caution in applying the harmless error rule in the administrative rulemaking context," as it may be "more readily abused there than in the civil or criminal trial context." *Riverbend Farms, Inc.*, 958 F.2d at 1487. An agency is never required to adopt proposals comments suggest, and it could always say it would have reached the same rule if it had followed the APA to the letter. *Id.* Courts must "focus on the process as well as the result." *Id.* "[A]lthough a showing of actual prejudice is not required under the prejudicial error rule," *Sprint Corp. v. FCC*, 315 F.3d 369, 377 (D.C. Cir. 2003), challengers should demonstrate "that on remand they can mount a credible challenge to the amended rule and were thus prejudiced by the absence of an opportunity to do so before the amendment," *Util. Solid Waste Activities Grp.*, 236 F.3d at 755.

Cases applying the prejudicial error rule to particular instances of administrative rulemaking have yielded a muddled series of results. *See generally* Craig Smith, Note, *Taking "Due Account" of the APA's Prejudicial-Error Rule*, 96 Va. L. Rev. 1727, 1739-53 (2010) (describing three different tests courts have applied). Still, "an utter failure to comply with notice and comment cannot be considered harmless if there is any

uncertainty at all as to the effect of that failure." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002); *see AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 89 (D.D.C. 2007) ("Where it applies, this rule substantially lessens if not altogether eliminates a challenging party's burden, for there will rarely if ever be no 'uncertainty' as to the error's effect."); *see also U.S. Steel Corp.*, 595 F.2d at 215 (holding, in a case in which the agency waived pre-promulgation notice and comment, "[a]bsence of such prejudice must be clear for harmless error to be applicable"); *Riverbend Farms, Inc.*, 958 F.2d at 1487 ("We have held that the failure to provide notice and comment is harmless only where the agency's mistake 'clearly had no bearing on the procedure used or the substance of decision reached.'" (quoting *Sagebrush Rebellion, Inc. v. Hodel,* 790 F.2d 760, 764-65 (9th Cir. 1986)); Smith, *supra*, at 1736 ("The rules mandating notice-and-comment periods, set forth in Section 553 of the APA, are among the most important provisions of that act, and courts strive to protect them.").

Such an error is generally not rendered harmless when the agency offers opportunities to comment after the rule was issued. *See U.S. Steel Corp.*, 595 F.2d at 215. The clear danger is that "[a]n agency that wished to dispense with pre-promulgation notice and comment could simply do so, invite post-promulgation comment, and republish the regulation before a

reviewing court could act." *Id.* As the Ninth Circuit has

distilled from its case law, the "distinction that makes the

difference between a procedural violation of the APA that is

harmless and one that is not," is that in the cases in which it

found no prejudice, "interested parties received some notice

that sufficiently enabled them to participate in the rulemaking

process before the relevant agency adopted the rule." *Paulsen*,

413 F.3d at 1007. In *Paulsen*, a challenge by federal inmates to

rules governing eligibility for substance abuse treatment early

release incentive programs, "the petitioners received no notice

of any kind until after the Bureau made the 1997 interim rule

effective." *Id.* at 1007. There was no "opportunity to protest

an already-effective rule prior to the time it was applied,"

such that it might offset the agency's error. *Id.; see also*

*Buschmann*, 676 F.2d at 358 (finding an interim rule concerning

support and maintenance for Social Security benefits

calculations invalid for issuance without notice and comment,

and holding that improperly relying on the good cause exceptions

was not harmless error because "of the importance of the notice

and comment procedure embodied in Section 553 and the failure to

comply"). "The purpose of prior notice and comment is to afford

persons an opportunity to influence agency action in the

formulative stage, before implementation, when the agency is

likely to be more receptive to argument." *Kollett v. Harris*,

619 F.2d 134, 145 (1st Cir. 1980).

Applying those principles to the Interim Rule, the Sixth Circuit rejected the government's argument that sidestepping notice and comment was harmless. *Utesch*, 596 F.3d at 312; *see also Cotton*, 760 F. Supp. 2d at 130 ("This Court is not persuaded by the harmless error argument advanced in the Dean concurrence."); *Gould*, 568 F.3d at 482 (Michael, J. dissenting). It found courts generally may apply a harmless error rule to uphold an agency regulation "when the procedural deficiencies did not defeat the purpose of the bypassed requirements." *Utesch*, 596 F.3d at 312. It clarified that "a reviewing court must focus not merely on the ultimate rule but on the process of an administrative rulemaking; otherwise, an agency could always violate the APA's procedural requirements based on the representation that it would have adopted the same rule had the proper process been followed." *Id.* With no opportunity for stakeholders to engage in the rulemaking prior to rule being issued, "the process was fatally flawed." *Id.* Nor did the advent of the SMART Guidelines change matters, as "[t]he fact that the Attorney General eventually made SORNA retroactive through legitimate means cannot sustain prosecution of an individual based on conduct committed long before the final guidelines' enactment." *Id.* Potentially holding the defendant criminally liable in advance of the law's valid application

would also pose significant Ex Post Facto Clause concerns.  *Id.*
at 312-13.  The Ninth Circuit, in dictum, agreed with the Sixth
Circuit's analysis.  *Valverde*, 628 F.3d at 1168 n.3.

By contrast, the Fifth Circuit found in the Interim Rule
the unique case worthy of excusing agency error, adopting a
position first articulated in a concurring opinion by Judge
Wilson of the Eleventh Circuit.  *Johnson*, 632 F.3d at 930-31;
*Dean*, 604 F.3d at 1288 (Wilson, J. concurring).  The *Johnson*
court appeared to rely significantly on the view that the choice
to apply SORNA to pre-Act offenders was a "yes or no decision,"
between two fully formed options that had already been presented
to the Attorney General.  632 F.3d at 932; *see Dean*, 604 F.3d at
1289 (Wilson, J. concurring).  In the Interim Rule's preamble,
the Attorney General referred to SORNA defendants' objections,
during their prosecutions, to the retroactive application of the
law.  *Johnson*, 632 F.3d at 931-32; *see* 72 Fed. Reg. at 8896.
While it would have been preferable to flesh out those concerns
through notice and comment, "the Attorney General nevertheless
considered the arguments Johnson has asserted and responded to
those arguments during the interim rulemaking."  *Johnson*, 632
F.3d at 932.  The contours of the two options already clear,
"[t]here is no suggestion that, if given the opportunity to
comment, Johnson would have presented an argument the Attorney
General did not consider in issuing the interim rule."  *Id.; see*

*Dean*, 604 F.3d at 1288 (Wilson, J. concurring). While

"continu[ing] to recognize the limitations of post-promulgation

comments," the Fifth Circuit nonetheless referenced the fact

that Johnson submitted none and the Attorney General was not

later moved to change course by comments to the SMART

Guidelines. 632 F.3d at 932-33 & n.121. The failure to comply

with the Publication Requirement, preventing pre-rule notice and

comment, was harmless. *Id.* at 933. Invalidating the Interim

Rule would be of no benefit where the record before the Attorney

General was straightforward.[8] *Id.*

 *Johnson*'s analysis is thorough, but the Court must

respectfully disagree. Instead, it is guided foremost by the

case law's strong presumption against applying prejudicial error

review to uphold rules issued without notice and comment. As

the Sixth Circuit described in *Utesch*, the lack of responsive

rulemaking here was a fundamental procedural defect. 596 F.3d

at 312. No interested parties, including those newly subject to

criminal sanction, had warning or opportunity to respond.

---

[8] In addition, the Fifth Circuit found waiver of the
Delay Requirement not prejudicial, because the defendant in that
case, as here, was charged with violating SORNA long after the
thirty day delay would have elapsed. *Johnson*, 632 F.3d at 930;
*see also Dean*, 604 F.3d at 1288 (Wilson, J. concurring). *But
see Cotton*, 760 F. Supp. 2d at 131 (stating this argument would
apply to any defendant charged outside the thirty day window and
would "eviscerate the good cause standard."). Since the Court
holds the error in failing to adhere to the Publication
Requirement was prejudicial in its own right, it does not
express an opinion on this question.

The Court also finds *Johnson*'s reading of the Interim Rule strained.  Even if the Court were to accept the premise that the Interim Rule was the answer to a binary question, the Attorney General did not give both options full consideration.  The Interim Rule only obliquely mentions contrary views by referring broadly to challenges raised by defendants in the midst of their criminal cases, not in the context of an administrative proceeding.  72 Fed. Reg. at 8896.  In entirety, the discussion of those views reads:

> Nevertheless, sex offenders with predicate convictions predating SORNA who do not wish to be subject to the SORNA registration requirements, or who wish to avoid being held to account for having violated those requirements, have not been barred from attempting to devise arguments that SORNA is inapplicable to them, e.g., because a rule confirming SORNA's applicability has not been issued.

*Id.*  This commentary is placed in the preamble, not in the portion of the regulation intended to justify departure from Section 553's standard requirements.  In fact, at the time he issued the Interim Rule, the Attorney General believed SORNA was retroactive from the date it was signed into law.  *Id.* at 8895 ("SORNA's direct federal law registration requirements for sex offenders are not subject to any deferral of effectiveness. They took effect when SORNA was enacted on July 27, 2006, and currently apply to all offenders in the categories for which SORNA requires registration.").  His goal was simply

"foreclosing any dispute" on this point. *Id*. at 8896. Since the Attorney General labored under a faulty assumption, as *Reynolds* would prove, that he was implementing an already active rule, it would seem quite unlikely that he nonetheless fully considered opposing viewpoints. The scant discussion in the Interim Rule certainly does not give the Court confidence that he did.

It bears mentioning further that *Johnson*'s premise of a yes or no decision is not airtight. True, congressional debates made quite clear that Congress worried about pre-Act "'missing'" offenders, and, as the Supreme Court opined in *Reynolds*, there is no reason to believe the Attorney General would ever refuse to act on those fears. 132 S. Ct. at 982-84. That, perhaps, was why Congress felt comfortable delegating the task even though it considered the pre-Act sex offender population to pose a deep threat. However, Congress left the details to the Attorney General's discretion, including which categories of pre-Act offenders would be covered and how much time to give those persons to comply before initiating criminal sanctions. *See id.* at 981-82. Similarly, absent significant guidance from the Attorney General as to exactly how SORNA would apply, and how it might interact with state law requirements, defendants might be subject to "the very kind of vagueness and uncertainty that criminal law must seek to avoid." *Id*. at 982. Congress

may have delegated the task precisely because it realized its nuances.

Reading the Interim Rule alone, it might seem the choice before the Attorney General did not admit of complexities.  But it disavows any effort "to address the full range of matters that are within the Attorney General's authority under Section 113(d)," 72 Fed. Reg. at 8896, and it does not appear to consider alternatives to immediately applying SORNA retroactively or exempting pre-Act offenders permanently.  The subsequent SMART Guidelines, the comprehensive regulatory guidance eventually issued by the Attorney General, illustrate the substantial role Congress tasked the Attorney General with playing in defining the details.  *See* 73 Fed. Reg. 38030-01; *Lott*, 2012 WL 2048218, at *3-4 (relying on the SMART Guidelines to resolve the defendant's vagueness challenge to the word "resides," as it relates to the situations in which a sex offender must register).  The trouble is not that the Interim Rule should have been as exhaustive as the SMART Guidelines proved to be.  It is that the Attorney General decided the key threshold question without permitting comments that might have alerted him to nuance and complication.

The Court must also part company with *Johnson* to the extent it provides that an opportunity to make post-promulgation comments when the public had no pre-implementation notice of the

Interim Rule and no chance to provide pre-promulgation comments, lends some support to finding harmless error. *See Paulsen*, 413 F.3d at 1007; *U.S. Steel Corp.*, 595 F.2d at 215. Here, there was no "opportunity to protest an already-effective rule prior to the time it was applied." *Paulsen*, 413 F.3d at 1007.

Without warning of the Interim Rule or a chance to weigh in on its shape, Mullins was immediately subject to SORNA's criminal penalties. He and those similarly situated concededly made up "virtually the entire existing sex offender population." Interim Rule, 72 Fed. Reg. at 8896. If Mullins had been given the opportunity to file pre-rule comments, he could have presented a colorable claim to at least mitigate the sharp effects of SORNA's sudden retroactive application to him. As Mullins notes in his brief, comments on the SMART Guidelines both pointed to the unfairness in applying the act retroactively and to the practical difficulties many offenders and jurisdictions faced in confirming old convictions. Def.'s Reply Br. 4. The Attorney General offered no hint that he weighed concerns such as these against his decision in the Interim Rule.

The Court has its doubts that Mullins's comments would alter the result, one ultimately confirmed by two different Attorney Generals in two presidential administrations. But it cannot conclude that there is no "uncertainty at all as to the effect of [the] failure" to consider them, *Sugar Cane Growers*

*Co-op.*, 289 F.3d at 96, that "[a]bsence of such prejudice . . . [was] clear," *U.S. Steel Corp.*, 595 F.2d at 215, or that "the agency's mistake clearly had no bearing on the procedure used or the substance of decision reached," *Riverbend Farms, Inc.*, 958 F.2d at 1487 (internal quotations omitted). Mullins, and those like him, had no chance to object when the agency may have been most "receptive to argument." *Kollett*, 619 F.2d at 145. *See Gould*, 568 F.3d at 482 (Michael, J. dissenting). Based on the arguments Mullins might have raised had the Attorney General not denied a pre-rule notice and comment period, failure to abide by the Publication Requirement was prejudicial.

### Conclusion

In light of the foregoing, the Court grants Mullins's motion to dismiss the indictment. Today's decision disposes of his case, but should otherwise be relatively limited. The Court has already concluded that the SMART Guidelines were valid in applying SORNA to pre-Act offenders. *Lott*, 2012 WL 2048218, at *5. This ruling only prevents the government from relying on the Interim Rule to charge sex offenders with violating SORNA during the period from February 2007, when the Interim Rule took effect, until August 2008, when the SMART Guidelines came into force. The government did not have a valid basis to prosecute pre-Act sex offenders under SORNA for conduct committed during that brief window.

Still, since this is a case of first impression in this Circuit that has divided other courts, the U.S. Court of Appeals for the Second Circuit may want to review the result before the status quo is altered.  The Court will stay its order thirty days, allowing the government to appeal and request an extension of the stay.

Dated at Burlington, in the District of Vermont, this 29th day of August, 2012.

/s/William K. Sesssions III
William K. Sessions III
U.S. District Court Judge